UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTTSDALE CAPITAL ADVISORS
CORPORATION and ALPINE
SECURITIES CORPORATION,

       Plaintiffs,

v.

FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.,

       Defendant.

_____/

Case No.:

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Scottsdale Capital Advisors Corporation ("SCA") and Alpine Securities Corporation ("Alpine") (collectively, "Plaintiffs"), by and though their undersigned attorneys, sue Financial Industry Regulatory Authority, Inc. ("FINRA") and allege as follows:

### INTRODUCTION

1.     In this action, Plaintiffs challenge the unconstitutional operation and structure of FINRA which has garnered and now wields massive power and governmental authority over the securities broker-dealer industry and the financial markets without adherence to the United States Constitution.

2.     Plaintiffs have standing to assert these claims because they are regulated parties, have experienced the direct impact of FINRA's unconstitutional operations,

and have suffered and will continue to suffer injury and damage as a result of its actions.

3. Plaintiffs' claims are not predicated upon a challenge to the application of any particular FINRA rule as applied to Plaintiffs or upon any particular FINRA action taken against Plaintiffs. Rather, the claims asserted in this case challenge the constitutionality of FINRA's structure and its very existence. As such, Plaintiffs' claims are collateral to any administrative proceeding involving Plaintiffs, any administrative review process, and the administrative review structure set forth in the Section 15A of the Securities Exchange Act of 1934 (the "Act"). The claims asserting constitutional violations are beyond the expertise of FINRA and are appropriately before this Court.

4. FINRA is an entity empowered by Congress through the Act to enforce federal securities laws and regulate the securities industry.

5. However, FINRA's current structure and operations, particularly in light of the transformation of the organization over the course of the last two decades, contravene the separation of powers, violate the Appointments Clause of the United States Constitution (the "Constitution") and constitute an impermissible delegation of powers. Because it purports to be a private entity, FINRA is unaccountable to the President of the United States (the "President," or "POTUS"), lacks transparency, and operates in contravention of the authority under which it was formed. It utilizes its own in-house tribunals in a manner contrary to Article III and the Seventh

Amendment of the Constitution and deprives entities and individuals of property without due process of law.

6.      FINRA wields expanded and comprehensive governmental police power, including the power to "enforce compliance" with the Act and other federal securities laws, to regulate the conduct of its members through rulemaking and adjudication, and to set its own budget and to fund its own operations by fixing and levying a tax on its membership.

7.      For example, FINRA has the power and discretion to promulgate rules and standards and the ability to enforce compliance with those rules and standards by levying fines on its members and barring its members from the industry.

8.      In connection with these open-ended powers, FINRA's Board of Governors (the "Board" or "FINRA's Board") has the power to set FINRA's budget at any level desired and to fund its operation through the collection of a "fee" levied on its members and by imposing "penalties" on its members. In 2021, for example, FINRA extracted more than $100 million in fines from its members, most of whom capitulate to FINRA's allegations and penalties precisely because of the enormous and unchecked power that it wields. FINRA has the authority to use the amounts that it collects to set its own salaries and is incentivized to continuously increase the amounts of penalties it imposes, expending those funds *inter alia* on exorbitant salaries of more than $3,000,000.00 per year to its Chief Executive Officer and over $1,000,000.00 per year to its Chief Financial Officer, Chief Legal Officer, Head of Member Supervision and Chief of Exams.

9.    FINRA also deploys its broad powers to impose burdensome, arbitrary, and ill-defined standards that it requires its members to follow, and it enforces those standards in an arbitrary, discriminatory, and unfair manner, all of which ultimately harms the investing public.

10.    While FINRA came into existence as a "self-regulatory" organization, it has been transformed into an organization operated and controlled by non-members that exercises vast governmental authority while failing to comply with its enabling act.

11.    FINRA's failure to abide by fundamental constraints on the delegation and exercise of governmental authority has caused and will continue to cause profound injury to participants in the securities industry, to the markets, and to the investors that FINRA claims to protect.

12.    Over the last twenty years, FINRA's initial formative structure, purpose, authority, and powers, which focused on regulating members within the narrow parameters set by FINRA rules, have transformed into a "for-profit" behemoth that is incentivized to and does exercise its unchecked power in a manner that maximizes its profits while avoiding any actual accountability to the executive branch.

13.    As a result of its characteristics and conduct, and notwithstanding FINRA's purported status as a private corporation, FINRA is a governmental entity and state actor subject to the limits of the United States Constitution, including the Constitution's separation of powers principles, the requirements of the Appointments

4

Clause, the Seventh Amendment, and the obligation to provide due process of law when depriving an individual of his livelihood or an entity of its property.

14.    Further, because FINRA exercises governmental powers, it is, for constitutional purposes, part of the federal government, and its employees — who exercise significant authority pursuant to the laws of the United States — are officers of the United States.

15.    FINRA and its officers are, however, not adhering to the Constitutional requisites that are essential for the proper oversight and function of any governmental entity that wields such enormous power, controls the livelihood of so many professionals and businesses, and impacts the market every day.

16.    Despite its vast authority and the far-reaching consequences of its actions, FINRA is immune from the supervision and control of the President. FINRA's Board is not appointed or removable by the President or by the head of any Executive Branch department answerable to the President. Thus, although FINRA exercises significant, core governmental powers, the FINRA Board is selected in a manner inconsistent with Article II of the Constitution.

17.    Indeed, the one government agency charged with the duty of operating as an Executive Branch "check" on FINRA's actions, the Securities and Exchange Commission ("SEC"), is empowered to and only exercises limited review and control of FINRA's governing body. The SEC may only remove members of the FINRA Board if they have "willfully violated" applicable laws or regulations, "willfully

abused" their authority, or "failed to enforce compliance" with applicable laws and regulations "without reasonable justification or excuse."

18.     FINRA's structure and operation, including its freedom from Presidential oversight and control and the method by which its Board is appointed and its in-house tribunals are constructed, contravene the separation of powers and the Appointment Clause. For this reason, FINRA and all power and authority exercised by FINRA violate the Constitution.

19.     Similarly, FINRA's use of an in-house judicial construct and its employment of its adjudicators violates Article III of the Constitution and the Seventh Amendment.

20.     FINRA possesses and deploys improperly and unconstitutionally delegated legislative power, including, but not limited to, its broad power to enact law, its authority to set its own budget without any constraint or legislative cap, and its authority to fund that budget through the imposition of a levy on all persons wishing to conduct business in the over-the-counter ("OTC") markets and, indirectly, on those investors that wish to participate in those markets.

21.     FINRA exercises its sweeping and coercive powers in a discriminatory manner designed to disadvantage market participants who operate in sectors of the markets that FINRA disfavors, particularly those like Plaintiffs whose business focuses on the microcap market.

22.     FINRA's failure to adhere to the same Constitutional principles and requisites as any other governmental entity is more than just a matter of principle and

adherence to law. It is negatively impacting the markets, burdening competition and impinging on the rights of investors and market participants. It has enabled FINRA to improperly exercise its sweeping authority to constrain and control the operation of securities firms, without regard for fundamental principles of free enterprise, the rights of private parties to enter into contracts, or the prohibition against deprivation of property without due process of law. It has enabled FINRA to create onerous and often ambiguous rules and standards that increase costs for industry members that are often passed on to investors.

23.     FINRA's actions have dramatically ratcheted up the regulatory, compliance, and legal costs associated with operation of a member firm. As a result, member firms are prevented from running their businesses in accordance with critical basic economic principles applicable to pricing and commerce, while the individual rights of market participants are affected as well.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

26.     SCA is a broker dealer that has a principal office in Scottsdale, Arizona, as well as an office in the Middle District of Florida. SCA is a registered member of and is regulated by FINRA.

7

27.     Alpine is a broker dealer with its principal office in Salt Lake City, Utah. Alpine is a registered member of and is regulated by FINRA.

28.     FINRA is a national securities association registered with the SEC pursuant to 15 U.S.C. § 78s and is authorized thereunder to enforce the Exchange Act, the SEC's rules and regulations thereunder, and its own rules (all of which are enforceable only by virtue of the SEC's approval of such rules). FINRA is a Delaware not-for-profit corporation with its principal place of business located at 1735 K Street NW, Washington D.C.  FINRA maintains offices and conducts business throughout the United States, including in the State of Florida and in this District. Notwithstanding, FINRA is an agency and/or establishment and/or instrumentality of the United States.

**GENERAL ALLEGATIONS**

**I.      The history of FINRA**

29.     In 1938, Congress passed the Maloney Act adding a new section 15A to the Exchange Act that authorized associations of brokers or dealers meeting certain statutory requirements to register with the SEC as a "national securities association." The Maloney Act's voluntary national securities associations were to be the OTC market counterparts to the regulatory arms of the exchanges (i.e., self-regulatory organizations ("SRO")).

30.     As the SEC explained shortly after the Maloney Act's passage, the act embodied "the principle of conferring upon regulatory groups from business a primary responsibility for enforcing high standards of business conduct upon their members . .

8

. [by setting] up a system of regulation in the over-the-counter markets through the formation of voluntary associations of investment bankers, dealers and brokers doing business in these markets under appropriate Governmental supervision." SEC, *Fourth Annual Report of the Securities and Exchange Commission: Fiscal Year Ended June 30, 1938* (Washington, D.C., SEC 1938), at 33. Thus, the purpose and intent of the legislation was to rely on "voluntary associations" comprised of those who possess the knowledge and practical experience borne of "doing business in these markets."

31.    A year later, the National Association of Securities Dealers ("NASD") became the first and only registered national securities association. Because no other associations had registered with the SEC, the NASD was the only SRO with "responsibility for enforcing … a system of regulation" for brokers and dealers in the OTC markets.

32.    In 1945, the NASD began requiring principal and customer-facing employees of broker-dealers to register with the NASD.

33.    In 1983, Congress mandated that broker-dealers wishing to conduct business in the OTC markets *must* register with the NASD and become subject to the NASD's regulatory powers. Membership was no longer "voluntary."

34.    In addition to the NASD, the New York Stock Exchange ("NYSE") played a significant historic role as an SRO enforcing securities laws and implementing a regulatory framework through its own rules.

35.    In 2007, the Securities and Exchange Commission (the "SEC") approved a plan that merged the member regulation operations of the NASD and the NYSE.

36.    The NASD absorbed the regulatory arm of the NYSE and changed its name to FINRA.

37.    FINRA now oversees virtually every aspect of the securities industry, regulating approximately 3,400 brokerage firms, 150,000 branch offices, and more than 610,000 individual registered securities representatives.

## II.    The enabling provisions

38.    Pursuant to 15 U.S.C. § 78o(a)(1), brokers and dealers, both natural persons and other than natural persons, are required to register with a registered securities association in order to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills).

39.    To participate in the securities industry, a broker dealer is *required* to maintain its membership with FINRA—a purportedly private entity.

40.    15 U.S.C. § 78o-3(b)(2) requires a registered securities association to have the capacity to enforce compliance by its members and persons associated with its members, with the provisions of the securities laws, the rules and regulations thereunder, the rules of the Municipal Securities Rulemaking Board, and the rules of the association.

41.    15 U.S.C. § 78o-3(b)(7) requires a registered securities association to implement rules that provide for the "discipline" of its members for violations of its rules and the federal securities laws by "by expulsion, suspension, limitation of

activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction."

42.    As a registered securities association, FINRA agreed to "comply ***with the [Exchange Act]*** and its own rules," (*id.* § 78s(g)(1)(A)) and to "enforce *[such] compliance* . . . by its members and persons associated with its members" (*id.*; *see also* 15 U.S.C. § 78s(h) (emphasis added).

43.    Thus, as alleged above, and as set forth in the relevant enabling provisions of 15 U.S.C. § 78, FINRA is both empowered and required by Congress to execute the laws of the United States.

## III.    FINRA's organization and operation violates the separation of powers

44.    The United States Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President.

45.    As alleged above, FINRA exercises wide-ranging executive power, including the power to "enforce compliance" with the Act and the securities laws, to enact rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

11

46.     FINRA's exercise of executive and administrative power is immune from Presidential supervision or control. FINRA's Board is not appointed or removable by the President.

47.     FINRA's Board is selected by FINRA's members and can only be removed by a majority vote of FINRA's Board or, in limited circumstances, the SEC.

48.     In particular, the SEC may remove members of FINRA's Board only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." 15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

49.     FINRA's acquisition and deployment of core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives. As a result, the operation of FINRA, as well as its implementation of responsibilities delegated to it by the SEC and the Maloney Act, violates the separation of powers.

## IV.     FINRA's hierarchy and its in-house tribunals violate the Appointments Clause

50.     Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board exercises significant authority pursuant to the laws of the United States, FINRA's Board members are officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

51.     The Appointments Clause provides in relevant part that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

52.     By virtue of the discretion, duties, functions, and independence of the FINRA Board, members of the FINRA Board are principal officers whose appointments must be made by the President with the advice and consent of the Senate as is required in relation to other government agencies. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

53.     In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board violates the Appointments Clause.

54.     Those who officiate over disciplinary proceedings, Officers from FINRA's Office of Hearing Officers, possess power and authority beyond that of a mere employee or functionary and exercise significant duties and discretion, akin to that of federal trial judges.

13

55. Hearing Officers render decisions that can result not only in substantial penalties but also in the closure of an entire firm or the barring of an individual, impacting the property and livelihood of FINRA members.

56. Hearing Officers' decisions, like those of Administrative Law Judges of the Securities and Exchange Commission, may become final and effective without any further consideration or review.

57. FINRA Hearing Officers are therefore "officers of the United States" within the meaning of the Appointments Clause, not mere employees.

58. Under the Appointments Clause, even "inferior Officers," must be appointed by "the President, in the Courts of Law, or in the Heads of Departments."

59. FINRA's Hearing Officers are chosen by FINRA staff and are not appointed in the manner prescribed by the Appointments Clause. Their actions and decisions are therefore unconstitutional and invalid.

**V.   By virtue of FINRA's unconstitutional hierarchy and structure, FINRA members and investors have been and will continue to be harmed.**

60. FINRA's unconstitutional leadership has caused and/or permitted a disintegration of FINRA's self-regulatory status and an escalation of aggressive, arbitrary, and discriminatory actions against certain of its members, resulting in damage to and closure of firms and harm to investors. Under FINRA's unlawful governance, it has targeted and badgered individuals and entities operating in the microcap markets like Plaintiffs to the point where it is choking off one of the few methods of financing for start-up and developing companies. Its investigative and

14

enforcement actions, while purportedly justified by FINRA's claim that it is protecting investors, actually defy the fundamental view that disclosure is the cornerstone of securities regulation; instead, it assumes that investors are naifs, incapable of assessing and understanding the risk and potential reward associated with the microcap markets and is thereby depriving investors of the ability to make their own investment decisions

## A.    FINRA fails to provide fair representation to its members

61.    15 U.S.C. § 78o-3(b)(4) requires the rules of a registered securities association to "assure a fair representation of its members in the selection of its directors and administration of its affairs."

62.    FINRA's rules do not assure a fair representation of its members in the selection of its directors and administration of its affairs because the rules require the majority of FINRA's Board, as well as critical committees of FINRA and the NAC, *not* to be associated with its members.

63.    As observed by SEC Commissioner Hester Peirce, "FINRA is not a self-regulator. Its members are not regulating themselves; they are being regulated by FINRA, just as they are regulated by the SEC." Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University at 27 (Jan. 2015); McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011) ("far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's

15

regulatory policy or corporate governance"); David R. Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2, Heritage Foundation, Feb. 1, 2017.

64.     Although FINRA's predecessor organizations were once truly "self-regulatory", that has transformed over the years such that FINRA is not. Pursuant to both its articles of incorporation and its bylaws, the number of its "public governors" (those not chosen by the industry) "shall exceed the number of Industry Governors." Thus, the industry does not control FINRA. And because the industry does not control FINRA, it is inappropriate to regard FINRA as an SRO. *See* Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2;   McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011) ("far from being 'members' of FINRA comparable to the former owners of seats in the NYSE and their associates, securities firms are today the functional equivalent of regulated entities with little or no input into FINRA's regulatory policy or corporate governance");.

65.     Similar requirements have developed regarding the composition of critical FINRA committees such that industry members now occupy only a minority position in relation to regulatory actions and review of disciplinary matters.

66.     FINRA's transformation has been characterized by—and is particularly unseemly because of—its aggressive posturing to avoid accountability to its membership, the SEC, Congress or the courts. As SEC Commissioner Pierce emphasized, the member firms over which "FINRA exerts meaningful control …

16

given the statutory requirement for membership" have only a limited ability to influence FINRA:

> Broker-dealers in the United States are regulated by the Financial Industry Regulatory Authority (FINRA). Although commonly perceived to be a self-regulator, FINRA is not accountable to the industry in the way a self-regulator would be. Nor is it accountable to the public, Congress, the president, or the courts. FINRA's structure and monopoly status shield it from close oversight.  Consequently, an important part of the securities markets is under the control of a regulator with limited accountability.

Hester Peirce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University, Abstract (Jan. 2015).

67.     Former SEC Commissioner Daniel M. Gallagher expressed similar concerns regarding FINRA's lack of influence from its members in combination with its efforts to compete with the SEC in terms of prosecutorial activity:

> This decrease in the "self" aspect of FINRA's self-regulatory function has been accompanied by an exponential increase in its regulatory output. As FINRA acts more and more like a deputy SEC, concerns about its accountability grow more pronounced.

Burton, *Reforming FINRA*, Backgrounder No. 3181 at note 55; *see* Hammond, *Double Deference in Administrative Law,* 116 Columbia L. Rev. 1705, 1771 (November 2016) ("the combination of oversight agencies' deference to SROs and judicial deference to oversight agencies undermines both the constitutional and regulatory legitimacy of SROs").

68.     As such, it is clear that FINRA is not controlled by the industry and cannot be properly characterized as a "self" regulator. FINRA has been transformed

17

into an agency that is no longer regulated by its members, that does not comport with the enabling provisions, and that lacks statutory authority for its actions.

**B.      FINRA does not provide a fair procedure for discipline of members**

69.      FINRA's lack of accountability is exacerbated by its insistence that it occupies a hybrid status, asserting and embracing the *benefits* of governmental immunity, like the SEC, while abjuring the *obligations* of the government including due process of law:

> Like Schrodinger's cat, simultaneously dead and alive, FINRA is, under current rulings, both a state actor (for purposes of barring liability and for tax purposes) and, generally, not a state actor (for purposes of absolving it of due process and other requirements and for liability purposes).

Burton, *Reforming FINRA*, Backgrounder No. 3181 at 3; *see also* Marianne K. Smythe, "Government Supervised Self-Regulation in the Securities Industry and the Antitrust Laws: Suggestions for an Accommodation," 62 N.C.L. Rev. 475, 483 1984; *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010); 94 McLaughlin, *Is FINRA Constitutional?*, 43 Sec. Reg. and L. Rep. 681 (Mar. 28 2011); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers*, 637 F.3d 112, 114–15 (2d Cir. 2011), cert. denied, 132 S. Ct. 1093 (2012); Richard L. Stone & Michael A. Perino, *Not Just a Private Club: Self-Regulatory Organizations as State Actors When Enforcing Federal Law*, 1995 Colum. Bus. L. R. 453. For a discussion of immunity as it has been applied in the SRO context, see Rohit A. Nafday*, From Sense to Nonsense and Back Again: SRO Immunity, Doctrinal Bait-and-Switch, and a Call for Coherence*, 77 U. Chi. L. Rev. 847, 847-85 (2010); Roberta S. Karmel, *Should Securities Industry Self-Regulatory Organizations*

*Be Considered Government Agencies?*, 14 Stan. J.L. Bus. & Fin. 151, 156 (2008) ("The problem of a delegation by a [government] agency, which is itself exercising statutorily delegated powers, to a private standard setting body like FINRA [for example] further confounds the question of whether the private body either is exercising delegated governmental power or is, indeed, a government entity. Yet, such privatization of governmental functions has become increasingly common." (citing, John J. Dilulio, Jr., *Response Government by Proxy: A Faithful Overview*, 116 Harv. L. Rev. 1271 (2002); Jody Freeman, *The Private Role in Public Governance*, 75 N.Y.U. L. Rev. 543 (2000); Gillian E. Metzger, *Privatization as Delegation*, 103 Colum. L. Rev. 1367 (2003); Steven J. Schwartz, *Private Ordering*, 97 Nw. U. L. Rev. 319 (2002)); Burton, *Reforming FINRA*, Backgrounder No. 3181 at 2 ("While it serves a governmental function and has coercive power, including the ability to completely bar firms and individuals from the marketplace, it is not subject to any of the normal transparency, regulatory review or due process protections normally associated with government.")

70.     15 U.S.C. § 78o-3(b)(8) requires the rules of a registered securities association to "provide a fair procedure for the disciplining of members and persons associated with members…."

71.     FINRA's rules do not provide for a "fair procedure for disciplining members and persons associated with members."

72.     In fact, FINRA's rules do not even provide its members and associated persons with basic components of due process of law.

19

73.     FINRA, claiming that it is not a government agency, expressly eschews any obligation to provide due process of law. As it wields massive power in the securities industry and pursues actions based on delegated authority from the SEC, it insists that it is not subject to governmental obligations like due process of law, and its position impacts and skews the entire breadth of its enforcement activity.

74.     FINRA does not apply the most basic rules of evidence in its proceedings and so, for example, paid FINRA employees are permitted to recount to a hearing panel layer upon layer of hearsay testimony regarding conversations supposedly had with investors and other regulators.

75.     Those who preside over FINRA's enforcement actions are employees of and paid by FINRA or its affiliated entities and the proceedings fail to provide for any right to a trial by a jury in violation of the Seventh Amendment, even where the allegations sound in fraud or other claims for which a jury trial is afforded under the law. Its disciplinary proceedings are conducted by its Office of Hearing Officers so those hearing officers are subject to the inherent pressure and conflict of interest that flows from being employed by one of the two litigants.

76.     Further, FINRA assigns those hearing officers to matters in ways that not only are completely opaque but also fail even to comply with the few protections that are afforded to a respondent under FINRA's own rules.

77.     FINRA also fails to recognize a Fifth Amendment privilege in its proceedings, forcing individuals to answer questions during FINRA proceedings by threatening to bar them from the industry, i.e., deprive them of their livelihood,

thereby creating and untenable and illegal scenario in which one constitutional right must be sacrificed to preserve a separate and distinct constitutional right.

78.    And FINRA's purported review process, which again relies on review by individuals paid by FINRA, is so insubstantial that the SEC passed a rule requiring firms to book adverse FINRA awards as a liability despite the pendency of an appeal because the "grounds for revision on appeal are very limited." *See* NASD Notice to Members 00-63.

79.    FINRA holds seemingly unfettered power over market participants, yet it fails to abide by the basic constraints and protections that serve to limit agency action and preserve the critical and constitutional rights of those subject to its authority.

80.    As noted in connection with FINRA's efforts to further expand its authority:

> FINRA's status as a nongovernmental regulator, however, enables it to avoid the scrutiny and procedural requirements to which a government agency performing the same tasks would be subject. Before FINRA succeeds in further expanding its regulatory footprint by taking on additional responsibilities, policymakers should revisit the long-debated questions about whether self-regulation works in its current manifestation and, if not, what should be done about it. One option would be to acknowledge that FINRA looks a lot like the SEC and accordingly fold FINRA into the SEC. Alternatively, FINRA could be remade into an organization that is run by the industry it regulates. In other words, FINRA could become a true self-regulator. Competing SROs might emerge to tailor regulation to a particular group of firms, such as smaller broker-dealers. Another option would be to enhance FINRA's public disclosure and procedural obligations. Procedural requirements should include a clear requirement to conduct and document economic analysis and greater procedural protections in connection with disciplinary actions.

Hester Pierce, *The Financial Industry Regulatory Authority: Not Self-Regulation After All,* Mercatus Center of George Mason University, at 27-28 (Jan. 2015) (footnotes omitted).

81.     In combination, FINRA's positions lead to a pernicious and destructive result: FINRA is not a regulator who must provide due process protections, but it is also supposedly not a private actor who may be sued for damages. It is unaccountable and immune at every turn.

82.     Worse yet, FINRA has achieved this result all the while it enforces federal securities laws and punishes broker-dealers for alleged violations of those laws by, among other things, stripping broker-dealers of their ability to conduct any business in the absence of protections guaranteed by the Due Process Clause.

## VI.     FINRA stifles competition, harms consumers and has caused and will continue to cause injury to Plaintiffs.

83.     FINRA is required to act in a manner that is not discriminatory and that does not impose any undue burden on competition.

84.     Yet, FINRA's actions in relation to Plaintiffs have been especially prolific and the events surrounding those proceedings illustrate the skewed and broken enforcement process that exists within FINRA.

85.      Beginning in May 2015, FINRA sought to sanction SCA for supposed violations of Section 5 of the Securities Act of 1933 (the "1933 Act").  Its determined enforcement efforts lasted over five years and included an affirmance by FINRA's

National Adjudicatory Council ("NAC"), before the matter reached the SEC, in September 2021.

86.   In a remarkable rebuke of the approaches used by FINRA and by the NAC to procure and then to affirm the findings of violations, the Commission set aside all findings of violations and all sanctions as against all defendants. With respect to John Hurry, the indirect owner of SCA, the Commission found that the NAC, in the appeal, developed and relied on a new theory of liability that was "untethered from any alleged violation of Section 5." *Scottsdale Capital Advisors Corp., et al.*, Exchange Act Release No. 932021 WL 4242630 at *9. The NAC thereby "*deprived [Mr. Hurry] of a fair opportunity* to rebut the theory under which he was held liable." *Id.* (emphasis added).

87.   Perhaps more concerning, the Commission found that FINRA relied on incorrect legal standards in its assertions of violations of Section 5 and that "the NAC incorrectly applied these legal standards" that should govern the application of that provision.  *Id*. at *12. The NAC thereby "failed to discharge its duty to fairly and accurately explain the basis for the finding that Scottsdale committed a violation." *Id*. at *13.

88.   The Commission also concluded that FINRA's findings of supervisory violations by SCA representatives was unsupported by the record evidence and error. The Commission noted, for example, that "the NAC decision states, and FINRA maintains before the Commission" that there was certain testimony relating to

23

Respondent Tim DeBlasi. *Id.* at *14. But there was not; "the evidence shows that another official at the firm" had responsibility for Section 5 compliance. *Id.* At 15.

89.    And finally, while FINRA argued and the NAC found that respondents "failed to supervise properly the firm's microcap liquidation business" (*Id.* at *15), the Commission held that there was extensive testimony concerning the firm's due diligence process and its analysis, confirming that the firm had "a process reasonably designed to ascertain whether an exemption was available." *Id.* at 16. Because FINRA failed to establish that "supervision of the due diligence process was unreasonable," the Commission also set aside findings of claimed violations of Rule 3010. *Id.* at *17.

90.    FINRA, as it pursues disciplinary proceedings, fails to provide due process of law, a neutral arbiter or a right to jury guaranteed by the Seventh Amendment, even where the charges sound in fraud. And worse, FINRA ignores and fails to apply the few protections that are afforded to respondents, and can avoid any effort by a member to enforce either the membership agreement or FINRA's own rules.

91.    Plaintiffs' experiences are just examples of how FINRA's unjustified actions have and will continue to result in damage and injury to Plaintiffs and other FINRA members including increased regulatory, compliance and legal costs, substantial loss of business and revenue, reputational damage, and millions of dollars in attorneys' fees. While Plaintiffs have the resources to bear these costs, FINRA's increasingly onerous compliance requirements have driven many small broker-dealers out of business.

**VII.** **A declaration from this Court is the only remedy available to check FINRA's powers.**

92.     Despite its characterization as a "self-regulatory" organization, FINRA is anything but. Indeed, FINRA's members are incapable of exerting any meaningful control of or change to the entity, and FINRA's articles and bylaws—requiring that the majority of its Board be comprised of non-industry members—ensure that it will remain that way.

93.     Nevertheless, this "self-regulatory" organization has expansive power to regulate the entire broker-dealer securities industry subjecting each person and entity in that industry, including Plaintiffs, to FINRA's rules, regulations, obligations, requirements, fines, fees, and enforcement actions.

94.     FINRA's very existence and its exercise of unbridled and unchecked powers violates the United States Constitution. FINRA's members are powerless to effectuate change within the organization. Thus, the Court is the only forum that affords the opportunity for relief.

95.     All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have occurred, have been performed, or have been waived.

96.     Plaintiffs have obtained undersigned counsel to represent them in this action and are obligated to pay their attorneys a reasonable fee for the services rendered.

## COUNT I
**(Violation of the Separation of Powers — Improper Exercise of Executive Power)**

97.    Plaintiffs reallege paragraphs 1 through 96.

98.    The Constitution provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

99.    As set forth above, FINRA exercises wide-ranging executive power, including the power to "enforce compliance" with the Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of brokers and dealers, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce compliance with the Act, the rules of FINRA, professional standards, and the securities laws.

100.    FINRA's wide-ranging exercise of executive or administrative power is immune from Presidential supervision or control. FINRA's Board of Governors are not appointed or removable by the President; rather, they are selected by FINRA's members.

101.    Even the SEC has limited authority review of FINRA's actions. The SEC may remove FINRA's Board of Governors only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse."

26

15 U.S.C. § 78s(h)(4)(B). The SEC's other review functions are similarly circumscribed.

102. FINRA's exercise of wide-ranging, core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives. As a result, the creation of FINRA, as well as its implementation of its delegated responsibilities by the SEC and the Maloney Act, violates the separation of powers.

## COUNT II
**(Violation of the Appointments Clause of the U.S. Constitution)**

103. Plaintiffs reallege paragraphs 1 through 96.

104. FINRA is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.

105. Because FINRA is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its Board of Governors exercise significant authority pursuant to the laws of the United States and are therefore officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

106. The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are

not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

107. By virtue of the wide-ranging discretion, duties, functions and independence of the FINRA Board, members of the Board are principal officers whose appointments must be made by the President by and with the advice and consent of the Senate. Accordingly, the selection of the FINRA Board by its membership violates the Appointments Clause.

108. In the alternative, the members of the FINRA Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department. Because FINRA's membership is not a department within the meaning of the Clause, the appointment of the FINRA Board by its membership violates the Appointments Clause.

**COUNT III**
**(Unconstitutional Delegation)**

109. Plaintiffs realleges paragraphs 1 through 96.

110. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

111. By virtue of the grant of wide-ranging authority the SEC delegated to the FINRA Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch.

28

112. This delegation is unconstitutional if the FINRA Board is deemed part of the federal government and is even more problematic if the FINRA Board is deemed to be a private entity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. An order and judgment declaring unconstitutional the provisions of law empowering FINRA to enforce compliance with the securities laws;

2. An order and judgment enjoining FINRA from carrying out any of the powers delegated to them by Congress or the SEC;

3. An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA is presently constituted and operating in a manner that violates the separation of powers set forth in the Article II of the Constitution;

4. An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that FINRA, in its exercise of disciplinary functions, is a state actor and subject to the obligation to respect the rights guaranteed under the Unites States Constitution;

5. Costs and attorneys' fees pursuant to any applicable statute or authority;

6. Such further relief as this Court deems just and appropriate.

/s/ *Kenneth G. Turkel*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@tcb-law.com
David A. Hayes – FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone: (813) 834-9191
Fax: (813) 443-2193

Maranda E. Fritz*
maranda@fritzpc.com
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: (646) 584-8231

*Pro hac vice application forthcoming

*Attorneys for Plaintiffs*